27 N.J. Super. 257 (1953)
99 A.2d 313
IN THE MATTER OF JOHN E. SELSER, CHARGED WITH CRIMINAL CONTEMPT.
STATE OF NEW JERSEY, PETITIONER-APPELLANT, AND
JOHN E. SELSER, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued July 13, 1953.
Decided September 9, 1953.
*259 Before Judges EASTWOOD, JOSEPH L. SMITH and HANEMAN.
Mr. David H. Harris argued the cause for the petitioner-appellant (Mr. Theodore D. Parsons, Attorney-General, and Mr. Albert M. Ash, Deputy Attorney-General, attorneys).
Mr. Albert S. Gross argued the cause for the defendant-respondent (Mr. John E. Selser, attorney).
New Jersey State Bar Association, amicus curiae (Mr. Mendon Morrill and Mr. John M. Kaufman, attorneys).
HANEMAN, J.S.C. (temporarily assigned).
On February 24, 1953 the defendant John E. Selser, a member of the Bar of the State of New Jersey, was called as a witness before the grand jury of Bergen County. Upon being sworn by the foreman of said grand jury the following questions were propounded to him:
*260 "Q. Well, just so we can clarify the record, I do want to ask you specifically if you will give us those names which were disclosed to you by your clients, as to who was paid protection money, and ask you to answer that specific question."
"Q. Now, I would like to ask you a specific question for the record. Can you give us the names of the persons receiving political contributions on the State and County level as given to you by your so-called racketeer clients?"
"Q. Well, did he [Willie Moretti] tell you that he [Willie Moretti] had been to Mr. Dickerson's home?"
"Q. Did he [Willie Moretti] tell you also with reference to the fact that a conversation occurred between him [Willie Moretti] and Dickerson?"
The questions were propounded to the defendant by the grand jury of Bergen County in connection with an investigation of gambling and law enforcement in said Bergen County, commenced by a special grand jury on January 2, 1951.
The defendant refused to answer each of said questions on the grounds that the information thus sought to be elicited was received by him as attorney for the respective parties mentioned in said questions and that therefore it was privileged and he was barred from furnishing the same unless his respective clients expressly waived the privilege.
Upon his refusal to furnish the answers to the questions so directed to him, a verified petition was filed by the Deputy Attorney-General, upon which an order was issued by J. Wallace Leyden, Superior Court Judge, directing him to show cause why he should not be ordered to answer the said questions.
Upon the filing of affidavits, the taking of testimony and argument of counsel, the said judge of the Superior Court discharged the order to show cause on the ground that there existed the relation of attorney and client between the said defendant and the persons from whom he had acquired the information sought and that such information was a privileged confidential communication. The court further held that until the said clients expressly waived this privilege the defendant was barred from testifying.
The State here appeals from the order and judgment discharging the order to show cause.
*261 The facts in connection herewith are as follows: On October 30, 1950 a complaint under oath was filed by Eugene A. Haussling, Lieutenant of the New Jersey State Police, charging Joseph Doto, Salvatore Moretti, James P. Lynch, Arthur Longano and Anthony Guarini with conspiracy to keep and maintain a place to which persons might resort for the purpose of gambling. On the same date a warrant was issued against the aforesaid persons so charged. On October 31, 1950, at two o'clock in the morning, the defendant received a telephone call from one Guarino Moretti, also known as Willie Moretti (by which name he will hereafter be referred to), as a result of which he was retained by the said Willie Moretti as his attorney and as attorney for the other five above-named individuals. He was then informed that the above-named five individuals were about to be arrested on warrants charging them with violations of the gambling laws of the State of New Jersey. The said warrant was served upon Joseph Doto and Salvatore Moretti on October 31, 1950. On the same date Joseph Doto and Salvatore Moretti were produced by their attorney, John E. Selser, at 11 A.M., and were arraigned on the said complaint and entered pleas of not guilty and bail was fixed. Thereafter, by arrangement with the said John E. Selser, who stated that he could not at that time get in touch with James P. Lynch and Arthur Longano, the said James P. Lynch and Arthur Longano were produced by the said John E. Selser on November 2, 1950 and were arraigned upon the said complaint aforesaid and entered pleas of not guilty and bail was fixed. Anthony Guarini, the other defendant against whom the said warrant was issued, was at the time of the issuance thereof confined in State Prison at Trenton under sentence previously imposed. The warrant against James P. Lynch and Arthur Longano was thereafter returned on November 2, 1950 by the said Eugene A. Haussling.
The above-named five defendants, with the exception of Willie Moretti, were subsequently indicted by the grand jury of Bergen County, to which they entered pleas of not guilty *262 on January 26, 1951. On May 21, 1951 the said individuals retracted the aforesaid pleas of not guilty and entered pleas of non vult. They were sentenced on May 28, 1951. Willie Moretti, from and after October 30, 1950, was not charged nor arrested nor indicted in Bergen County until November 7, 1952. On that date the said Willie Moretti, who was then deceased, having been murdered by persons unknown, was indicted by the Bergen County grand jury, together with Harold John Adonis, Andrew Adonis and others whose names were not known to the grand jury at the time of the indictment, upon a charge of a continued conspiracy to obstruct the due administration of the laws of this State, which said conspiracy allegedly commenced in 1947 and continued thereafter.
Subsequent to October 31, 1950, according to the defendant, he had numerous conversations and conferences with all of the parties involved, and especially with Willie Moretti. According to the defendant, and there is no testimony to contradict this statement, the said Willie Moretti consulted him concerning various consummated transactions in which the said Willie Moretti had been involved and which he feared might result in his indictment by the said grand jury.
The communications from Willie Moretti to the defendant as his attorney concerning these facts and acts were of possible criminal conduct already accomplished, and the advice sought was in connection with past actions and not as to any future or prospective commission of crime. It is highly conceivable and entirely plausible that Willie Moretti, finding himself finally in the vulnerable position in which he stood, would have consulted the defendant prior to an actual complaint or indictment, having in mind the nature of the investigation being conducted. It was during these conferences that the defendant obtained the information sought by the grand jury.
In this posture of the case, it must be concluded that the defendant represented all of the above-named parties, not only in connection with the crime for which the five of them were indicted, but as well in connection with other matters in *263 which they were involved and for which they might be indicted, including the corruption or bribery of public officials.
The affidavits filed by the defendant and the testimony are replete with statements which show that the relationship of attorney and client for the above purposes existed between the defendant and the six named individuals. As a matter of fact, the Deputy Attorney-General in his examination of Mr. Selser frequently referred to Willie Moretti and the five other named individuals as Mr. Selser's "clients." Nowhere in its brief does the State dispute this relationship of attorney and client.
The basis for the privilege accorded communications from a client to an attorney are very aptly stated in Matthews v. Hoagland, 48 N.J. Eq. 455 (Ch. 1891).
Initially, the privilege of a communication by a client to his attorney was objective rather than subjective. It involved a consideration for the oath and honor of the attorney rather than for the apprehension of his client. In the early part of the 18th Century there was developed a new theory upon which this privilege was bottomed, providing subjectively for the client's freedom of apprehension in consulting his legal adviser. Since then, however, by gradual development, the essential requisites preceding the valid interposition of such a privilege, and the privilege itself, have become recognized to be as follows:
"(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived."
8 Wigmore on Evidence (3rd ed.), p. 558.
In State v. Loponio, 85 N.J.L. 357 (E. & A. 1913), the court said:
"Where, therefore (enlarging somewhat upon the language of Professor Wigmore), legal advice of any kind is sought from a duly-accredited professional legal adviser in his capacity as such, the *264 communications relevant to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself, or by the legal adviser, or by the agent of either confidentially used to transmit the communications, except the client waives the protection. Wigm. Ev., sec. 2292; Hatton v. Robinson, 14 Pick. 416, 31 Mass. 416."
The Canons of Professional Ethics of the American Bar Association, made a part of the rules promulgated and adopted by our Supreme Court, provide, in part, as follows:
"It is the duty of a lawyer to preserve his client's confidence. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that his obligation prevents the performance of his full duty to his former or to his new client.
If a lawyer is accused by his client, he is not precluded from disclosing the truth in respect to the accusation. The announced intention of a client to commit a crime is not included within the confidence which he is bound to respect. He may properly make such disclosures as may be necessary to prevent the act or protect those against whom it is threatened."
There were here present both the professional confidence and professional employment which would ordinarily make the communications confidential and would bar the defendant from testifying, absent an express waiver from his clients. The facts disclose the requirements listed as 1 to 5 in the above quotation from Professor Wigmore.
The main contention of the State, however, is that, conceding the relationship of attorney and client, the information imparted to Mr. Selser was
"given for an unlawful or fraudulent purpose, and was not furnished by the said persons for any lawful purpose nor for the purpose of preparing a lawful defense nor for the purpose of assisting the defense of the other defendants aforesaid, who were all charged, pursuant to the indictments indicated hereinabove, with conspiracy to maintain a place where persons might resort for the purpose of gambling, and individually with the maintenance of various places where persons might and did resort for the purpose of gambling."
*265 The State relies heavily upon the following quotation from Matthews v. Hoagland, 48 N.J. Eq. 455 (Ch. 1891):
"In order that the rule may apply, there must be both professional confidence and professional employment, but if the client has a criminal object in view in his communications with his solicitor, one of these elements must necessarily be absent. The client must either conspire with his solicitor or deceive him. If his criminal object is avowed, the client does not consult his adviser professionally, because it cannot be the solicitor's business to further any criminal object. If the client does not avow his object he reposes no confidence, for the state of facts, which is the foundation of the supposed confidence, does not exist. The solicitor's advice is obtained by a fraud."
and upon similar language in In the Matter of Stein, 1 N.J. 228 (1949).
There can be no doubt, however, that if the advice sought by Willie Moretti was in furtherance of the commission of a crime or the perpetration of a fraud, whether this purpose were known to his attorney or not, that the privilege would not extend to such communications. Matthews v. Hoagland, 48 N.J. Eq. 455 (Ch. 1891); In the Matter of Stein, 1 N.J. 228 (1949). See also Russell v. Second National Bank of Paterson, 136 N.J.L. 270 (E. & A. 1947); State v. Krich, 123 N.J.L. 519 (Sup. Ct. 1939).
The theory of the State is that Willie Moretti was a participant in a conspiracy to corrupt public officials and that the last alleged overt act in that connection occurred some 10 or 12 days subsequent to the retention of the defendant as his attorney when the said Willie Moretti approached one John J. Dickerson with the avowed intent and purpose of attempting to have him intercede "to have the grand jury go easy on him in the light of the fact that he had been contributing this money."
The appellant has further stated its position in the following language in its brief:
"Any information imparted to Selser by Guarino (Willie) Moretti in connection with the identity of individuals to whom protection money was paid and the individuals who received from Moretti cash political contributions could only have been in connection with and *266 in a discussion of and in furtherance of Moretti's expressed or concealed intention to obstruct the administration of the laws by exerting unlawful and corrupt influence by means of John J. Dickerson who at the time of the discussion with Moretti in this regard was the Chairman of the State Republican Committee. This purpose and intention on Moretti's part is demonstrated in his conversation with Mr. Dickerson on November 12, 1950, some twelve days following the issuance of warrants against Joseph Doto, et als. (A5a and A7a)."
The State suggests that the conclusion of a fraudulent or criminal intent must be arrived at solely because of the proximity of the dates of the consultation with counsel (John E. Selser) and the conference with John J. Dickerson for the above avowed purpose. The record is bare of any proof as to what type of advice was or might have been given by the defendant to the said Willie Moretti in furtherance of his alleged criminal conduct. Actually, it is difficult to conceive what type of advice the defendant could have given Willie Moretti in connection with his future attempt to influence John J. Dickerson to obstruct the due administration of justice by exerting the unlawful and corrupt influence upon him, unless it is implied that the defendant advised and counselled the said Willie Moretti to so intercede with said John J. Dickerson. Although such a conclusion was disavowed by the State upon the oral argument, the innuendo to that effect remains present. Such a conclusion may not be based upon innuendo alone.
The State has failed to prove that the information was imparted by Willie Moretti for the purpose of the prospective commission of a crime or the perpetration of a fraud. There is lacking any proof which would vitiate the privileged nature of the disclosure to the defendant.
As above noted, this privilege is a privilege of the client and not of the attorney. The privilege is not availed of by the affirmative action of the client in objecting to a question propounded to his attorney, but rather by the affirmative action of the attorney in refusing to answer, which latter course he is ethically bound to pursue. The attorney is barred from testifying as to such communications, *267 not by reason of the affirmative objection of the client, but is barred as a matter of course unless and until the client himself affirmatively waives the privilege. It becomes the duty of the attorney to refuse to answer a question which would elicit from him confidential communications received from a client unless and until the client expressly so waives such privilege. This arises not only from the principles set forth in the above cited cases, but as well by reason of Canon 37 of the above cited Canons of Professional Ethics. It appears as well that although such waiver must be expressly made by the client during his lifetime, if he be living, at his death such client's personal representative must so waive. 8 Wigmore on Evidence (3rd ed.), p. 634.
Therefore, in the light of the failure of the appellant to obtain an express waiver from the executor or administrator of the said Willie Moretti, the defendant was bound, as a member of the Bar of this State, under the facts here present, to refuse to answer the propounded questions.
The order and judgment will therefore be affirmed.
JOSEPH L. SMITH, J.S.C. (temporarily assigned) (dissenting).
The question herein presented is of great importance to the administration of criminal law as well as to the Bar of the State of New Jersey and its citizens. The question is: Was the defendant-respondent, John E. Selser, a member of the Bar of the State of New Jersey, entitled to claim the privilege of confidential and privileged communication under the alleged relationship of his acting as attorney for his alleged client, Guarino (Willie) Moretti?
First, this court desires to emphasize as strongly as it is possible its belief in the rule that an attorney or counsellor is not permitted and cannot be compelled to testify as to communications made to him in his professional character by his clients, unless the clients consent. The attorney-client relationship creates this privilege. 28 R.C.L., Attorney and Client, sec. 8, p. 548.
The English courts applied the privileged communication rule at an early period and for at least three centuries *268 it has been steadily upheld. The foundation of the rule is not difficult to discover. It is not on account of any particular importance which the law attributes to the legal profession, or any particular disposition to afford it protection. Rather, it is out of regard for the interest of justice and its administration, which cannot be administered without trained members skilled in jurisprudence, the practice of the courts and in those matters affecting rights and obligations which form the subject of all judicial proceedings.
Originally, of course, suitors appeared personally before the tribunal which interpreted and administered the law. However, when the application of legal principles and practice and procedure became more complicated and intricate, the services of persons having knowledge of the one and skill in the other were demanded. Thus, to protect the rights of parties litigant, the procurement of the services of persons skilled in the law became universal.
No man being compellable to testify against himself, where it might incriminate him, or to disclose the weakness of his own case, it follows almost as a necessary sequence that the person who represented him and presented his interests could not do so.
If it were otherwise, the free administration of justice would be restricted and the ascertainment and enforcement of rights endangered so that no one would tell his attorney his entire case. Blackburn v. Crawfords, 3 Wall 175, 18 L.Ed. 186 (1865); Doherty v. O'Callaghan, 157 Mass. 90, 31 N.E. 726, 34 A.S.R. 258, 17 L.R.A. 188 (Sup. Jud. Ct. 1892); Whiting v. Barney, 30 N.Y. 330, 86 Am. Dec. 385 (Ct. App. 1864).
The factual background discloses that the grand jury of Bergen County, third stated session, September term 1951, while continuing an investigation of gambling and corruption commenced by a special grand jury on January 2, 1951, in the course of its investigation heard as a witness Mr. John E. Selser, an attorney and counsellor-at-law of New Jersey, who appeared before the aforesaid grand jury on February 24, 1953. He was duly sworn by the foreman. The Deputy *269 Attorney-General engaged in questioning witnesses before the said grand jury thereupon asked Mr. Selser the questions which appear more fully in petition filed below. The witness refused to answer the said questions upon the ground that the person from whom he obtained the information, Guarino (Willie) Moretti, was his client and his client was entitled to the privilege of confidential communication. That the information so acquired by Mr. Selser was acquired by him as a lawyer engaged in representing a client, Willie Moretti.
Upon the said Mr. Selser's refusal to furnish the answers to the questions directed to him, a verified petition was filed by the Deputy Attorney-General upon which an order to show cause was issued by the judge of the Superior Court why he should not be ordered to answer the questions set forth in the said verified petition. Thereafter, and before the return day of the order to show cause, the said John E. Selser served and filed an affidavit resisting the application, and in answer thereto the Deputy Attorney-General served and filed an answering affidavit in support of the application.
On the return day of the order to show cause, Mr. Selser was sworn and gave testimony under the examination by the court and Mr. Ash to the effect that the person from whom he had acquired the desired information communicated the said information to him as a client and that his said client was entitled to the privilege of confidential communication. The joint legislative committee through its counsel, Mr. Augustus C. Studer, also urged that the order be granted, as applied for by Mr. Ash.
After hearing the arguments of counsel and considering the affidavits on both sides and brief submitted on the part of the State, the court below discharged the order to show cause upon the ground that the person from whom the said Mr. Selser had acquired the information sought was entitled to the privilege of confidential communication because of the attorney-client relationship existing between Mr. Selser and Willie Moretti.
*270 The State here appeals from the order and judgment discharging the order to show cause.
Many questions were asked by the Deputy Attorney-General, and answered by the witness when he was a grand jury witness. Certain other questions were propounded which Mr. Selser contends if answered would violate the rules of ethics of his profession and perhaps submit him to disciplinary proceedings before the Supreme Court for a violation of the said rules of ethics. These questions Mr. Selser refused to answer and these questions are the ones which are before this court on this appeal.
There is no statutory provision affording privilege to a witness by reason of confidential communication to an attorney. This privilege comes down through common law and the 37th canon of professional ethics embedded in the rules of the Supreme Court of our State. In order for the rule of privilege to apply, there must be both professional confidence and professional employment. Matthews v. Hoagland, 48 N.J. Eq. 455 (Ch. 1891). Canon 37 provides:
"It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client.
If a lawyer is accused by his client, he is not precluded from disclosing the truth in respect to the accusation. The announced intention of a client to commit a crime is not included within the confidences which he is bound to respect. He may properly make such disclosures as may be necessary to prevent the act or protect those against whom it is threatened."
Our statute, N.J.S. 2A:81-4 provides:
"Except as otherwise provided by statute, a witness shall not be excused from answering any questions relevant and material to the issue."
*271 The following canons of professional ethics are enlightening.
"16. Restraining Clients from Improprieties.
A lawyer should use his best efforts to restrain and to prevent his clients from doing those things which the lawyer himself ought not to do, particularly with reference to their conduct towards Courts, judicial officers, jurors, witnesses and suitors. If a client persists in such wrong-doing the lawyer should terminate their relation."
"32. The Lawyer's Duty in Its Last Analysis.
No client, corporate or individual, however powerful, nor any cause, civil or political, however important, is entitled to receive, nor should any lawyer render any service or advice involving disloyalty to the law whose ministers we are, or disrespect to the judicial office, which we are bound to uphold, or corruption of any person or persons exercising a public office or private trust, or deception or betrayal of the public. When rendering any such improper service or advice, the lawyer invites and merits stern and just condemnation. Correspondingly, he advances the honor of his profession and the best interests of his client when he renders service or gives advice tending to impress upon the client and his undertaking exact compliance with the strictest principles of moral law. He must also observe and advise his client to observe the statute law, though until a statute shall have been construed and interpreted by competent adjudication, he is free and is entitled to advise as to its validity and as to what he conscientiously believes to be its just meaning and extent. But above all a lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man and as a patriotic and loyal citizen."
"41. Discovery of Imposition and Deception.
When a lawyer discovers that some fraud or deception has been practiced, which has unjustly imposed upon the court or a party, he should endeavor to rectify it; at first by advising his client, and if his client refuses to forego the advantage thus unjustly gained, he should promptly inform the injured person or his counsel, so that they may take appropriate steps."
It is fundamental that not every communication proceeding from a client to a lawyer establishes the privilege of confidential communication.
"The continuous and unbroken stream of judicial reasoning and decision is to the effect that communications between attorney and client having to do with the client's contemplated criminal acts, or in aid or furtherance thereof, are not covered by the cloak of privilege ordinarily existing in reference to communications between attorney and client. * * * But the loss of privilege does not depend upon the showing of a conspiracy or upon proof that the *272 attorney is involved in the furtherance of a criminal purpose. The privilege may be lost even though the attorney is innocent. The relaxation of the rule in this respect is not in contravention of sound public policy, but rather tends to the maintenance of a higher standard of professional ethics, by preventing the relation of attorney and client from operating as a cloak for wrongdoing." 58 Am. Jur., Witnesses, sec. 516.
"It is settled that in order that a communication between a lawyer and his client may be privileged, it must be for a lawful purpose or in furtherance of a lawful end. The existence of an unlawful purpose prevents the privilege from attaching. This is true as well where the rule as to privileged communications is embodied in the statutes." Ibid., sec. 515.
It is the State's contention that the information asked in the questions under consideration, that is, the information imparted to Mr. Selser by Willie Moretti in connection with the identity of individuals to whom protection money was paid and the individuals who received from Moretti political contributions, were in connection with and in a discussion of and in a furtherance of Moretti's intention to obstruct the administration of law by exerting unlawful and corrupt influence by means of and upon Mr. John J. Dickerson who, at the time of the discussion with Willie Moretti, was chairman of the State Republican Committee.
The State argues that this purpose and intention on Moretti's part is demonstrated in his conversation with Mr. Dickerson on November 12, 1950. This was 12 days following the issuance of criminal warrants against Joseph Doto, Salvatore Moretti, James P. Lynch, Arthur Longano and Anthony Guarini. Therefore, the State contends that Willie Moretti is not entitled to the privilege of confidential communication under the rules of common law and the Canons of Professional Ethics. Matthews v. Hoagland, supra, Canon 32, supra.
The questions asked are as follows:
(1) "Q. Well, just so we can clarify the record, I do want to ask you specifically if you will give us those names which were disclosed to you by your clients, as to who was paid protection money, and ask you to answer that specific question."
(2) "Q. Now, I would like to ask you a specific question for the record. Can you give us the names of the persons receiving political *273 contributions on the State and County level as given to you by your so-called racketeer clients?"
(3) "Q. Well, did he [Willie Moretti] tell you that he [Willie Moretti] had been to Mr. Dickerson's home?"
(4) "Q. Did he [Willie Moretti] tell you also with reference to the fact that a conversation occurred between him [Willie Moretti] and Dickerson?"
(5) "Q. Do you know whether or not your clients  I am referring now to Joseph Doto, Solly Moretti and Willie Moretti  were personally acquainted with Harold Adonis?"
The failure to answer Question No. 5 is no longer before this court, as the State has abandoned it.
The four questions insofar as they relate to anyone other than Willie Moretti, that is, as to conversations with five defendants, clearly come within the rule of privileged communication. However, as to the questions insofar as they relate to Willie Moretti alone, it seems to me the first inquiry is: Did the relationship of attorney and client exist as between Mr. Selser and Willie Moretti? I believe, from a reading of the record before us, no such relationship existed. It is quite true that Mr. Selser claims he was attorney for Willie Moretti and his position is that if he answered the questions propounded he would violate the Canons of Professional Ethics and the laws of our State. This relationship of attorney and client, as I have previously stated, where it exists, does create the privilege of confidential relationship and may not be divulged except with the consent of the client.
Willie Moretti was not charged with any criminal offense. A witness before the grand jury is not entitled to counsel at his appearance. Of course, one is entitled to have legal advice even though not charged with a criminal offense. The record does not show specifically in what matter or for what reason Willie Moretti received any legal advice from Mr. Selser, nor does it disclose why he needed counsel. Mr. Selser testified, under questioning of the court, as to legal services he rendered to the five defendants, but he was not asked nor did he testify as to services he claims to have rendered Willie Moretti. The mere fact that Willie Moretti *274 was a racketeer in and of itself does not mean, at the time it is claimed he was Mr. Selser's client, that legal advice was sought. The record clearly discloses that Willie Moretti was acting in behalf of the aforenamed five defendants, against whom a criminal complaint had been made and subsequently an indictment found.
There is nothing to show he at any time asked for or received any legal advice, except Mr. Selser's own statement that he was so retained. Certainly he was retained to represent the five defendants under criminal charges.
The criminal law should be administered not only to protect the criminal but also to protect the public. The rights of the public surely are as important as the criminal's. One may claim a privilege but he also has certain moral obligations and duties to discharge in connection therewith. Therefore, this court, feeling there is no such relationship as attorney and client, necessarily concludes no privilege existed.
I am unable to find any evidence in the record that Willie Moretti retained Mr. Selser to act as his counsel in the investigation of gambling proceedings in question or in any other matter or matters at that time except as heretofore stated by Mr. Selser. The record is silent as to any reason why Willie Moretti needed the advice of counsel or that he should seek the aid or counsel of Mr. Selser. Mr. Selser has not borne the burden of proof in establishing this relationship.
Mr. Selser answered certain questions and thereby waived any confidential relationship he claims to have existed.
Willie Moretti paid, except for the last payment, all the legal fees received by Mr. Selser for all the aforenamed defendants. I am cognizant of the difficulty which presents itself at times in the establishment of the attorney-client relationship.
The communication must have been made to the attorney acting for the time being in the character of legal advisor. 1 Greenleaf on Evidence, sec. 239, 243; State v. Krich, 123 N.J.L. 519 (Sup. Ct. 1939); Anderson v. Searles, 93 N.J.L. 227 (E. & A. 1919).
*275 While the payment of a retainer is evidence that the relationship of attorney and client exists, such a payment is not absolutely essential to the existence of the relationship. The further fact that Mr. Moretti conferred with Mr. Selser at least 200 times, as disclosed by the testimony of Mr. Selser, is impressive to show that the legal advice was not sought by Willie Moretti but that these conferences related to and were concerned with Mr. Selser's representation of those who had previously been charged and indicted for a crime, to which indictment the aforesaid Joseph Doto et als. subsequently pleaded and were sentenced. It seems incredible that such a large number of conferences were held without the record showing a single instance as to the purpose or reason for same. Moretti was acting as the agent or go-between for Joseph Doto, also known as Joe Adonis, Salvatore Moretti, also known as Solly Moore, Anthony Guarini, Arthur Longano and James Lynch, also known as Piggy Lynch.
Mr. Selser suggests that these questions are hearsay and as such inadmissible. The Bergen County grand jury was not acting on an indictment laid before it charging Willie Moretti with the commission of a crime. It was using its inquisitorial powers in the conduct of its investigation.
Chief Justice Maltbie, speaking for the Connecticut Supreme Court of Errors in the case of State v. Kemp, 126 Conn. 60, 9 A.2d 63 at page 69 (1939), said:
"In its charge the trial court instructed the jury that in interrogating witnesses neither they nor the state's attorney were bound by any rules of evidence. The grand jury did not have laid before it an indictment charging an individual or individuals with the commission of a specific crime, but was charged with the duty of investigating a certain situation where it was suspected that criminal acts had taken place. To restrict a grand jury, in carrying on an investigation of this kind, to eliciting only such testimony as would be admissible in court, would greatly impair its ability to ferret out criminal conduct, and we know of no principle of law which requires that while in pursuance of such an inquiry it is bound by the rules of evidence. As applied to the situation then before the court the charge was correct as far as it went. When a grand jury is considering an indictment laid before it, charging *276 an individual or individuals with a specific crime, it should no doubt restrict the evidence it elicits to that which is admissible in the trial of cases; United States v. Rubin, D.C., 218 F. 245, 246; United States v. Kilpatrick, D.C., 16 F. 765, 771; 2 Wharton, Criminal Procedure, 10th Ed., § 1291; and when it is engaged in a general investigation it should return an indictment against an individual or individuals only when that indictment is justified by such evidence."
The foregoing rules of law dispose of this question. In my opinion, the ruling of the Superior Court, Law Division, should be reversed.